FILED
MAR 11 2020 AM
THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA ) | 20 CR 149 |
| ) | |
| v.  ) | Violation: Title 18, United States |
| ) | Code, Section 1343 |
| SEE Y. WONG  ) | JUDGE NORGLE |
| | MAGISTRATE JUDGE COX |

The UNITED STATES ATTORNEY charges:

1. At times material to this information:

    a. Emerald Homes LLC, located in Chicago, Illinois, was a company that developed condominiums. SEE Y. WONG was an owner of Emerald Homes.

    b. Cathay Bank was a financial institution, located in Chicago, Illinois, and elsewhere, the deposits of which were insured by the Federal Deposit Insurance Corporation. Cathay General Bancorp was the parent company of Cathay Bank.

    c. In approximately March 2007, Cathay Bank extended an approximately $13.7 million construction loan to Emerald Homes to develop and build a condominium building called Canal Crossing. The construction loan was memorialized in an agreement that WONG signed as an owner of Emerald Homes. WONG also personally guaranteed the construction loan.

    d. The terms of the construction loan agreement between Cathay Bank and Emerald Homes required Cathay Bank to pay out portions of the loan as WONG provided proof that portions of the construction of Canal Crossing were completed. The

agreement required WONG to make repayments on the loan as the condominium units were completed and sold to buyers.

  e. The agreement further provided that Cathay Bank held liens on the condominium units and would not release those liens unless Cathay Bank received a certain price for each condominium unit.

  f. The agreement further required WONG to submit to Cathay Bank copies of the contracts signed by buyers for purchase of condominium units. The agreement required WONG to put a portion of the money deposited by buyers prior to closing into a segregated bank account held by the bank, called an escrow account. That money was to be held by the bank until closing to cover the closing costs.

  g. The Troubled Asset Relief Program was a federal program created in 2008 to enable financial institutions like Cathay General Bancorp to expand the flow of credit to U.S. consumers and businesses. Cathay General Bancorp received $258 million in funds from the Troubled Asset Relief Program on or about December 5, 2008.

  2. Beginning in or around the summer of 2009 and continuing until in or around the fall of 2011, at Chicago, in the Northern District of Illinois, Eastern Division, and elsewhere,

SEE Y. WONG,

defendant herein, devised, intended to devise, and participated in a scheme to defraud Cathay Bank and buyers of condominium units at Canal Crossing, and to obtain money and funds from Cathay Bank and buyers of condominium units at Canal Crossing by

means of materially false and fraudulent pretenses, representations, and promises, and by concealment of material facts, which scheme affected a financial institution and is further described below.

3. It was part of the scheme that defendant WONG fraudulently obtained approximately $1 million from victim buyers by making and causing to be made materially false representations to victim buyers, including materially false representations about defendant WONG's authority to offer discounted purchase prices for units at Canal Crossing and about defendant WONG's intention to keep victim buyers' payments in an escrow account.

4. It was further part of the scheme that defendant WONG caused Cathay Bank to continue making installment payments on the construction loan by making and causing to be made materially false representations to Cathay Bank, including materially false representations about the purchase prices for which defendant had contracted with victim buyers and about escrow payments received from victim buyers.

5. It was further part of the scheme that WONG induced victim buyers to purchase condominium units at Canal Crossing by offering vastly discounted prices, without disclosing the discounted purchase prices to Cathay Bank, knowing that Cathay Bank would not honor the discounted purchase agreements and would not release its liens on the condominium units, and without disclosing to the victim buyers that Cathay Bank would not release its liens on the condominium units at the discounted prices.

6. It was further part of the scheme that WONG told potential victim buyers that he could give them a 40% to 50% discount off of the purchase price of the condominium units if they paid all the money up front, without waiting for building to be completed or for closing, and that these funds would be placed in a specially designated escrow account. In fact, WONG did not have authority from Cathay Bank to offer these discounts and did not put this money in a specially designated escrow account.

7. It was further part of the scheme that WONG used victim buyers' money for other purposes, including towards construction costs. WONG did this despite knowing that both the terms of his loan agreement with Cathay Bank and the terms of his purchase agreements with the victim buyers required him to put the money in a specially designated escrow account. WONG hid from both the victim buyers and Cathay Bank the fact that he was misusing the deposit money, because WONG knew that Cathay Bank would no longer have continued to fund the construction loan had it known that WONG was using victim-buyer deposits for construction costs rather than keeping the money in a specially designated escrow account.

8. It was further part of the scheme that in one instance, on or about May 18, 2010, instead of depositing the deposit check from one victim buyer into the Cathay Bank escrow account, WONG signed the deposit check over to WONG's friend, as a personal loan.

9. It was further part of the scheme that, in some instances, WONG instructed victim buyers that they could not disclose the discount they were getting to anyone, so

that WONG could continue to hide from Cathay Bank both the vastly discounted purchase prices and the misused escrow deposit money.

10. It was further part of the scheme that, in some instances, WONG required victim buyers to sign two contracts: one purchase agreement, titled condominium purchase and sale contract, that stated one sale price, and a second agreement, titled memorandum of understanding, that listed a vastly discounted purchase price and stated that the buyer was required to pay the money up front in order to earn the discount.

11. It was further part of the scheme that WONG gave the bank copies of only the condominium purchase and sale contracts, which listed the full price for the condominium units. WONG concealed the memoranda of understanding from the bank.

12. It was further part of the scheme that, in some instances, in order to conceal from the bank that he had received deposit money from victim buyers, WONG fraudulently altered the copies of the condominium purchase and sale contracts that he gave to Cathay Bank, crossing out the paragraph that stated WONG would keep the buyers' deposit money in escrow.

13. It was further part of the scheme that, in many instances, when the condominium units were completed, WONG leased out the condominium units to other individuals, rather than turning them over to the victim buyers, and retained the proceeds of these leases, without the knowledge or authority of the buyers.

14. It was further part of the scheme that, in many instances, to conceal the scheme, WONG lulled victim buyers with false representations. For example, WONG

5

told some victim buyers that they could not close on a condominium unit because he was having trouble with the bank, when, in fact, WONG delayed the closing so that Cathay Bank would not learn about the unauthorized discounts WONG had given the victim buyers.

15. It was further part of the scheme that WONG concealed, misrepresented, and hid, and caused to be concealed, misrepresented, and hidden, the existence of the scheme, the purposes of the scheme, and the acts done in furtherance of the scheme.

16. As a result of the scheme, beginning in approximately July 2010, victim buyers were required to pay the remainder of the purchase price to Cathay Bank in order to close on the condominium units. Victim buyers who did not pay the remainder of the purchase price to Cathay Bank lost the entire value of their payments to WONG. In total, the victim buyers lost approximately $1 million, and Cathay Bank lost approximately $1.8 million.

17. On or about May 18, 2010, in the Northern District of Illinois, Eastern Division, and elsewhere,

SEE Y. WONG,

defendant herein, for the purpose of executing the scheme to defraud, knowingly caused to be transmitted by means of wire communication in interstate commerce certain writings, signs, and signals, namely an interstate wire transfer processed through the Federal Reserve System in the amount of approximately $170,100, from a Pacific Global

Bank account to an account controlled by WONG at Cathay Bank, the funds of which represented the purchase payment for a condominium unit by Victim A;

In violation of Title 18, United States Code, Section 1343.

                                           _____
                                           UNITED STATES ATTORNEY